Charles Lee SEMPLE, Jr., Administrator of the Estate of Deborah Louise Semple, deceased, Amanda Lone Suarez, a minor, by Charles Lee Semple, Jr., her grandfather and guardian and Angela Marie Suarez, a minor, by Charles Lee Semple, Jr., her grandfather and guardian, Plaintiffs,

v.

CITY OF MOUNDSVILLE, a municipal corporation, Defendant,

and

Theresa A. SEMPLE, Administratrix of the Estate of Scott A. Semple, Deceased, Plaintiff,

v.

CITY OF MOUNDSVILLE, a municipal corporation, Defendant,

and

Kermit Z. GARRISON, Administrator of the Estate of James K. Garrison, deceased, Plaintiff,

v.

The CITY OF MOUNDSVILLE, a municipal corporation, Defendant.

Civil Action Nos. 5:95CV17, 5:95CV18 and 5:95CV96.

United States District Court, N.D. West Virginia.

April 28, 1997.

closes the invention of an oven with one steam source to one with ordinary skill in the art.

William E. Watson, Wellsburg, WV, Jan C. Swensen, Swensen, Perer & Johnson, Pittsburgh, PA, for Theresa A. Semple, Charles Lee Semple, Jr., Amanda Lone Suarez, Angela Marie Suarez, Kermit Z. Garrison.

Joseph S. D. Christof, II, Gail W. Kahle, Dickie, McCamey & Chilcote, Wheeling, WV, for City of Moundsville.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STAMP, Chief Judge.

#### I. *Introduction*

These three consolidated civil actions arise out of the tragic multiple homicides and suicide following a longstanding domestic dispute between Deborah Semple and Michael Suarez. On August 6, 1994, Michael Suarez shot and killed Deborah Semple, James K. Garrison and Scott A. Semple in the presence of Amanda Suarez and Angela Suarez, the daughters of Deborah Semple and Michael Suarez. Suarez then shot and killed himself. The personal representatives of the

Semple and Garrison estates and Amanda and Angela Suarez, by their guardians, filed these suits against the City of Moundsville to recover for the alleged wrongful deaths of their decedents. By these suits, plaintiffs claim that the City of Moundsville, West Virginia, through its police department, violated the decedents' federal civil rights and violated certain state laws. Following discovery, the City filed a motion for summary judgment. For the reasons set forth in detail below, this Court finds that the defendant's motion for summary judgment should be granted.

#### II. *Procedural History*

On February 17, 1995, plaintiffs Charles Lee Semple, Jr., Administrator of the Estate of Deborah Louise Semple, deceased, Amanda Lone Suarez, a minor by Charles Lee Semple, Jr., her grandfather and guardian, and Angela Marie Suarez, a minor by Charles Lee Semple, Jr., her grandfather and guardian, filed Civil Action No. 5:95CV17 against defendant, City of Moundsville, a municipal corporation, seeking damages under 42 U.S.C. § 1983 and under West Virginia's Wrongful Death Statute, W. Va.Code § 55–7–6. On that same date, Theresa A. Semple, Administratrix of the Estate of Scott A. Semple, deceased, filed an identical action against the City of Moundsville (Civil Action No. 5:95CV18). On May 25, 1995, plaintiffs in Civil Action No. 5:95CV17 filed an amended complaint. Subsequently, on May 30, 1995, plaintiff in Civil Action No. 5:95CV18 filed an identical amended complaint. Further, on July 15, 1995, Kermit Z. Garrison, Administrator of the Estate of James K. Garrison, deceased, filed a civil action identical to Civil Action Nos. 5:95CV17 and 5:95CV18 (Civil Action No. 5:95CV96). After dismissing plaintiffs' punitive damages claims in Civil Action Nos. 5:95CV17, 5:95CV18 and 5:95CV96 and denying defendant's motion to dismiss the amended complaint in Civil Action Nos. 5:95CV17, 5:95CV18 and 5:95CV96 for purposes of discovery and trial.

On February 4, 1997, defendant City of Moundsville filed a motion for summary judgment. On February 14, 1997, plaintiffs [1]

---

1. Hereinafter, "plaintiffs" refers to all plaintiffs in Civil Action Nos. 5:95CV17, 5:95CV18 and 5:95CV96.

filed a response to the motion. On February 21, 1997, the City of Moundsville filed a reply to its motion for summary judgment. Finally, on February 28, 1997, plaintiffs filed a surreply[2] to the defendant's motion for summary judgment.

### III. *Statement of Undisputed Material Facts*[3]

This Court finds that the following material facts[4] are relevant to the issues presented by the defendant's motion for summary judgment:

1. Deborah Louise Semple ("Deborah") was involved in a long-term relationship with Michael A. Suarez ("Michael").

2. Plaintiffs filed a motion for leave to file a surreply. This Court GRANTS plaintiffs' motion for leave to file a surreply and the surreply is DEEMED FILED.

3. During the pre-trial conference held in this matter on March 17, 1997, plaintiffs' counsel represented to this Court that plaintiffs' investigation into the facts of this case was ongoing and that plaintiffs could not indicate exactly what witnesses would be testifying nor could they indicate the content of some witnesses' testimony. Defendant's counsel objected to allowing plaintiffs to add any new witnesses based upon a continuing investigation because the time for discovery had ended and because the defendant had no knowledge of new witnesses and had been afforded no opportunity to depose such witnesses. Further, plaintiffs' counsel represented that he had recently received new information, through the records of Amanda Suarez' psychologist, regarding what Amanda saw on the day of the shootings. Plaintiffs' counsel indicated that he was continuing to discover information concerning the matter, that he did not want to go to trial before exploring the impact of this information on the case and that he was willing to have the case continued in order to pursue the information.

With regard to both the continuing investigation and the new information, this Court finds that both were improper because discovery closed in this matter on December 31, 1996. Thus, absent a good reason for permitting the introduction of evidence disclosed beyond the discovery period, the evidence should not be considered. Plaintiffs have shown no good reason for this Court to permit plaintiffs to introduce as evidence information discovered from an ongoing-investigation. This matter has been pending since 1995 and plaintiffs have had sufficient time to conduct an investigation. · Further, with regard to the newly discovered evidence from the psychologist's records, this Court finds that the production of such records was in plaintiffs' control and that the late disclosure is not

2. Two children were born to the couple: Amanda Lone Suarez ("Amanda") and Angela Marie Suarez ("Angela").

3. Scott A. Semple ("Scott") was Deborah's brother.

4. James K. Garrison ("Garrison") was a friend of Deborah's.

5. Defendant City of Moundsville ("the City") is a municipal corporation.

6. Domestic violence was present in Deborah and Michael's relationship.

7. On January 15, 1989, Deborah called the Moundsville Police Department and filed a misdemeanor battery charge against Mi-

excusable. Accordingly, to the extent that plaintiffs wished this Court to consider any of the foregoing in relation to the motion for summary judgment, this Court finds that considering such evidence would be inappropriate.

4. This Court notes that the vast majority of the exhibits submitted by the parties in support of and in opposition to the motion for summary judgment do not comply with the requirements of Fed.R.Civ.P. 56. Fed.R.Civ.P. 56 requires that "affidavits used for summary judgment purposes ... set forth admissible evidence...." Rule 56(e) further requires the party to attach " 'sworn or certified copies to all documents referred tot in the affidavit.' " *Orchard Group, Inc. v. Konica Medical Corp.*, 918 F.Supp. 186, 190 (N.D.Ohio 1996). "In order for a document to be considered in support of or in opposition to a motion for summary judgment, it must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Burnett v. Stagner Hotel Courts, Inc.*, 821 F.Supp. 678, 683 (N.D.Ga.1993), *aff'd*, 42 F.3d 645 (11th Cir. 1994). However, uncertified or otherwise inadmissible documents may be considered by the court in ruling on a motion for summary judgment if the documents are not challenged. *Id.* at n. 2; *see also Jones v. Owens–Corning Fiberglas Corp. and Amchem Products, Inc.*, 69 F.3d 712 (4th Cir.1995). Except to the extent that defendant has objected to certain evidence presented by plaintiffs on hearsay grounds, neither party has objected to the consideration of the evidence on the grounds that the evidence does not comply with the requirements of Fed.R.Civ.P. 56. Thus, although most of the evidence submitted by the parties in support of and in opposition to the motion for summary judgment is not properly attested and/or authenticated, this Court will consider the evidence, except for the hearsay evidence to which defendants have objected, in deciding the summary judgment motion.

chael for an alleged incident of abuse. Michael was arrested and was released on bond the day of the arrest. Ten days later, Deborah signed a form requesting that the battery charge be withdrawn, and Marshall County Magistrate Mark A. Kerwood dismissed the battery charge against Michael.

■ 8. Patricia Rodgers, Deborah's mother, testified in her deposition that prior to 1994 she contacted the Moundsville Police Department about Michael's violent behavior towards Deborah. Rodgers further testified that from January to June 1994, she contacted the Moundsville Police Department regarding Michael's abusive behavior toward Deborah on approximately six occasions.[5]

9. On June 21, 1994, Deborah called the Moundsville Police Department from a pay telephone to report that Michael had abused and threatened her at her 22 Oak Avenue residence, that Michael had loaded guns at the residence and that Amanda and Angela were still at the residence. Moundsville police officers responded to the call and assisted Deborah in removing Amanda and Angela from the home. The officers advised Deborah of her rights as an alleged victim of domestic violence and provided her with a copy of the Moundsville Police Department's Victims Information Sheet.

10. On June 21, 1994, Deborah filed a Family Violence Petition at the Marshall County Magistrate's Office. Magistrate Mark Kerwood issued a Family Violence Temporary Protective Order directing Mi-

chael to "refrain from contacting, telephoning, communicating, harassing, or verbally abusing [Deborah]...."[6]

11. Moundsville Police Department policy stated that the police would promptly serve protective orders.

12. Several unsuccessful attempts were made to serve Michael with the Temporary Protective Order. On June 23, 1994, Deborah phoned the Moundsville Police Department and advised that Michael had taken her car. Deborah further indicated that she did not want to file a complaint about the car. Approximately two hours later, Michael called the Moundsville Police Department and was advised of the Family Violence Protective Order. Although the Moundsville Police Department was aware of the location of the phone call, no attempt was made to serve Michael with the protective order at that location.

13. On June 23, 1994, Deborah's mother called the police department and was advised that Michael was aware of the protective order and would be arrested if he came to Deborah's residence.

14. On June 24, 1994, Deborah called the Moundsville Police Department and advised the Michael had been at her residence. The police promised that Deborah would get an extra patrol for the night.

15. On June 24, 1994, Magistrate Kerwood conducted a final hearing on the domestic violence complaint and ordered that

---

5. Rodgers further testified that from 1989 to 1994 Deborah and other members of her family contacted the Moundsville Police Department about Michael. Defendant challenges these statements by Patricia Rodgers as inadmissible hearsay that cannot be considered by the Court when deciding the motion for summary judgment. This Court agrees that Ms. Rodgers' statements concerning the number of times Deborah and other family members called the Moundsville Police Department during the years of 1987 through 1994 are hearsay statements. Rodgers further stated in her deposition that Deborah told her that on one occasion she requested that the Moundsville Police Department escort her to her home to pick up some belongings and that police officers had met Deborah at her home for that purpose and that she felt safe when accompanied by the police. Defendant challenges these statements as inadmissible hearsay and this Court agrees. Therefore, Ms. Rodgers' statements re-

garding certain contacts with the Moundsville Police Department and Deborah's request for a police escort will not be considered in resolving the summary judgment motion.

6. Plaintiffs assert that the protective order also prohibited Michael from contacting Deborah's "mother and family." However, after reviewing the Family Violence Temporary Protective Order (Plaintiffs' Exhibit U, incomplete, and Defendant's Exhibit E), this court cannot find any reference to Deborah's mother or family in the order. This Court finds that plaintiffs may be referring to Deborah's Family Violence Petition filed June 21, 1994 in which Deborah requests that the protective order require that Michael stay away from her "mother and family." The actual Family Violence Temporary Protective Order, however, does not grant that relief.

Michael was prohibited from contacting Deborah. Magistrate Kerwood contacted the Moundsville Police Department and advised that "when [Michael] is seen, he can be served and lodged in jail if he violates the order."

16. On June 26, 1994, Deborah called the Moundsville Police Department and reported that Michael had been at her house earlier that day. She indicated that she knew "nothing could be done now," but asked if an officer would respond if Michael returned and she "just got her name out."

17. On June 27, 1994, the Moundsville Police Department responded to a call from Deborah's mother requesting that the police go to 22 Oak Avenue, Deborah's residence. Within three minutes of the phone call, the police officers arrived at the home to find that Michael had broken a window, entered the residence, pointed a gun at Deborah's head, struck her with the gun, attempted to choke her and threatened to kill her.

18. On June 27, 1994, the police arrested Michael and charged him with felony wanton endangerment with the use of a firearm, felony malicious assault, and misdemeanor stalking.

19. On June 27, 1994, Michael was arraigned before Marshall County Magistrate William Anderson who set Michael's bond at $75,000.00. Michael's bond contained a provision that he was to have no contact with Deborah.

20. On June 27, 1994, Michael was served with the final protective order.

21. After the June 27, 1994 incident, Deborah moved to her mother's home in nearby Wheeling, West Virginia.

22. On July 1, 1994, a surety bond was posted on Michael's behalf and he was released from jail.

23. On July 1, 1994, the Moundsville Police Department attempted to notify Deborah that Michael had been released from jail. After failing to reach Deborah, the Police Department notified Deborah's mother and father of Michael's release.

24. On July 6, 1994, Deborah phoned the Moundsville Police Department and reported that Michael had been telephonically harassing her, her father, her babysitter and her housekeeping supervisor. Arrangements were made at that time for Deborah to contact Magistrate Kerwood to report these violations.

25. On July 7, 1994, Deborah met with employees of the Marshall County Assistant Prosecuting Attorney's Office.

26. On July 7, 1994, Deborah filed a criminal complaint against Michael. Based upon that complaint, Marshall County Magistrate David Buzzard issued a warrant for Michael's arrest for the misdemeanor charge of a violation of the final protective order.

27. On July 7, 1994, Deborah called the Moundsville Police Department and stated that Michael was at the rear of Deborah's house and was shouting obscenities at her.

28. On July 7, 1994, a Moundsville police officer arrived at the scene and arrested Michael. Michael was brought before Magistrate Kerwood who released him on a $500.00 personal recognizance bond.

29. On July 13, 1994, an anonymous caller indicated that Michael had vandalized a screen door at 22 Oak Avenue. The Moundsville Police Department responded to the residence and notified Deborah's father of the incident. Deborah's father advised the police that Deborah was no longer living at the 22 Oak Avenue residence. On that same date, Deborah called the Moundsville Police Department to inquire whether Michael had been arrested. The Police Department told her that he had not been arrested.

30. During the time period between June 1994 and August 1994, the Moundsville Police Department had no contact, direct or indirect, with Scott or James concerning Deborah's problems with Michael.

31. On August 6, 1994, Deborah arrived at 22 Oak Avenue with Amanda, Angela, Scott, and James. Scott was armed with a loaded handgun. At approximately 1:30 p.m. on that date, the police received a telephone call from Deborah reporting that Michael had vandalized the 22 Oak Avenue residence. At that time, Deborah did not request police assistance. Four minutes later, a young girl

called from the home. Deborah picked up the phone and advised the dispatcher that one of the girls was playing with the phone and had hit the redial button. Again, Deborah advised that "everything was fine." Finally, at 1:43 p.m., Deborah made a frantic call advising that Michael was in the house. Three minutes later, at 1:46 p.m., Moundsville Police Officers arrived at the scene to discover that Michael had shot and killed Deborah, James and Scott and then shot and killed himself.

32. The Moundsville Police Department has a written Domestic Violence Policy which was in effect on August 6, 1994.

33. In his report, plaintiffs' expert, Dr. Lee Weinberg, stated that the Moundsville Police Department Domestic Violence Policy was "a modern and proper written policy for police procedures for handling domestic violence and protective orders."

### IV. *Summary Judgment Standards*

Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Id.* The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.,* Rule 56(c) itself provides that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511. *See also Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th

Cir.1979) (Summary judgment "should be granted only in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." (*citing Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950))).

In *Celotex,* the Court stated that "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. *Oksanen v. Page Memorial Hosp.,* 912 F.2d 73, 78 (4th Cir. 1990). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### V. *Discussion*

#### 1. *Introduction*

In their respective complaints, plaintiffs allege four counts against the City of Moundsville. First, plaintiffs allege that the City of Moundsville violated the substantive due process rights of Deborah, Amanda, Angela, Scott and James under the Fourteenth Amendment of the United States Constitution by failing to adequately protect them from Michael's violent behavior. Second, plaintiffs allege that the City violated the procedural due process rights of Deborah, Amanda, Angela, Scott and James by failing to advise Deborah of her statutory rights pursuant to West Virginia statute regarding remedies available to victims of domestic abuse and by failing to timely serve Michael with the Family Violence Temporary Protective Order in derogation of a statutory directive. Third, the plaintiffs allege that the City is liable for a violation of Deborah, Amanda, Angela, Scott and James' right to equal protection under the Fourteenth Amendment because the police department discriminated against them based upon Deb-

orah's status as a woman and upon Deborah, Amanda, Angela, Scott and James' status as victims of domestic violence. Finally, the plaintiffs allege that the City is liable under West Virginia law for negligently and/or intentionally failing to protect, Deborah, Angela, Amanda, Scott and James from Michael.

As discussed below, this Court finds that all of plaintiffs' claims must fail. First, plaintiffs cannot survive summary judgment on their claims of substantive due process violations. Plaintiffs argue that a "special relationship" giving rise to substantive due process rights as contemplated by the United States Supreme Court in *DeShaney v. Winnebago County Dept. of Soc. Serv.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), existed between the Moundsville Police Department and Deborah, Amanda, Angela, Scott and James. However, this claim is fundamentally without merit because they were not in the custody of the Moundsville Police Department as required by *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995), such that a "special relationship" existed. Further, plaintiffs have failed to show that the police created or enhanced the danger faced by Deborah, Amanda, Angela, Scott and James in relation to Michael. Finally, even if plaintiffs could show that certain police officers increased the danger to Deborah, Angela, Amanda, Scott and James, the plaintiffs have presented no evidence to create a genuine issue of material fact that the actions taken by police to increase the danger resulted from a City of Moundsville custom or policy.

This Court finds that plaintiffs' claim of a procedural due process violation must fail for six separate reasons. First, the West Virginia statutes cited by plaintiffs as the basis for the procedural due process claim do not give rise to a liberty or property interest that is protected by the Fourteenth Amendment. Second, this Court finds that even if Deborah had a property interest arising from the statutes that required police to advise domestic violence victims of available assistance, Deborah was in fact advised of those rights upon at least one occasion. Third, this Court finds that even if Deborah was entitled to procedural due process protections under the statutes, the statutes did not apply to James or

Scott. Fourth, plaintiffs have failed to show that the Family Violence Temporary Protective Order vested in Deborah any cognizable property interest in having the order served upon Michael and receiving police protection. Fifth, the plaintiffs have failed to establish that Amanda, Angela, Scott or James had a cognizable property interest in the service of and protection under the protective order. Finally, plaintiffs have failed to show that any failure to advise Deborah, Amanda, Angela, Scott and James of available assistance and to serve the protective order was a result of a municipal custom or policy.

This Court finds that plaintiffs' equal protection claims fail as well. Plaintiffs have failed to produce any evidence that the Moundsville Police Department was motivated by a discriminatory intent in allegedly failing to provide the same protection to Deborah, Amanda, Angela, Scott and James as it did for other victims of assault. Further, even if plaintiffs could properly allege an equal protection claim, plaintiffs have not shown that the violation was the result of a City custom or policy.

Finally, this Court finds that plaintiffs' state law claims cannot survive defendant's motion for summary judgment. Defendant City is statutorily immune from suit for its alleged failure to protect or to have an adequate method for protecting Deborah, Amanda, Angela, Scott and James from the danger they faced. Further, plaintiffs have failed to show that either Deborah, Amanda, Angela, Scott or James justifiably relied on any alleged promises or assurances made by police regarding police protection. Therefore, plaintiffs have not shown the existence of a "special relationship" that would cause the City to lose its immunity protection under the statute. Finally, even assuming plaintiffs have set forth a viable state law claim, this Court finds that the state law claims could be dismissed without prejudice pursuant to 28 U.S.C. § 1367.

**2. *42 U.S.C. § 1983 Claims for Civil Rights Violations***

**a. *Municipal Liability Under 42 U.S.C. § 1983***

■ In this case, plaintiffs seek recovery only from the City of Moundsville, a munici-

pal corporation. In suits against municipalities for civil rights violations, plaintiffs must prove both that a civil rights violation occurred and that the violation can properly be imputed to the municipality. Accordingly, in evaluating the defendant's motion for summary judgment, not only must this Court must consider the viability of plaintiffs' § 1983 claims on their own merits, this Court must also consider whether the plaintiffs have met the requirements for imposing liability for civil rights violations upon a municipality.

A municipality cannot be liable for the unconstitutional acts of its employees under a theory of respondeat superior. Rather, "municipal liability [for civil rights violations] results only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'" *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987), *cert. denied sub nom.*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988), citing *Monell v. Department of Social Serv.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *see also Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993) ("In order to hold a municipality liable under § 1983 for the conduct of employees below the policy making level, a plaintiff 'must show that the violation of his constitutional rights resulted from municipal custom or policy.'" (citations omitted)). Further, the Fourth Circuit has noted that fault for a constitutional violation can be assigned to a municipality only when a policy or custom is "(1) fairly attributable to the municipality as its 'own,' . . . and is (2) the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (citations omitted).

The Fourth Circuit in *Spell* defined "policy" as a "'course of action consciously chosen from various alternatives' respecting basic governmental functions, as opposed to episodic exercises of discretion in the operational details of government." *Id.* at 1386 (citations omitted). The *Spell* court described "custom" as "'persistent and widespread . . . practices of [municipal] officials [which] [a]lthough not authorized by written law, [are]

so permanent and well-settled as to [have] the force of law.'" *Id.* (citations omitted). Further, the Fourth Circuit noted that

[where] a municipal "policy or custom" *is* itself unconstitutional, the causal connection between the policy and violation. is manifest and does not require independent proof. . . . But, a policy or custom that is not itself unconstitutional in this strict sense must be independently proven to have caused the violation. Proof merely that such a policy or custom was "likely" to cause a particular violation is not sufficient; there must be proven at least an "affirmative link" between the policy or custom and violation. . . .

*Id.* at 1388.

b. *Substantive Due Process Claims Under 42 U.S.C. § 1983*

In *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995) ("*Pinder II*"), the Fourth Circuit Court of Appeals, sitting en banc, recently clarified its position on "failure to act" substantive due process claims under 42 U.S.C. § 1983. In *Pinder II*, Carol Pinder's former boyfriend, Don Pittman, broke into her home, abused her, and threatened her. Responding to a call, Officer Johnson arrived at Pinder's home and placed Pittman under arrest. Pinder asked Officer Johnson if it would be safe to return to work and leave her children at home. Officer Johnson assured Pinder that Pittman would be in jail at least until the next morning. Based on this assurance, Pinder returned to work. Later that same evening, Pittman was released from custody on his on recognizance. Pittman then returned to Pinder's home and set her house on fire, killing Pinder's three children. *Id.* at 1171–72. Pinder sued the City and Officer Johnson under 42 U.S.C. § 1983, alleging that the defendants had violated their affirmative duty to protect her and her children from Pittman, thereby depriving them of their constitutional right to due process under the Fourteenth Amendment.

Reversing its opinion in *Pinder v. Johnson*, 33 F.3d 368 (4th Cir.1994), *rev'd*, 54 F.3d 1169 (4th Cir.1995), *cert. denied*, —— U.S.

——, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995) (*"Pinder I"*), the Fourth Circuit held that "the Due Process Clause of the Fourteenth Amendment does not require governmental actors to affirmatively protect life, liberty or property against intrusion by private third parties." 54 F.3d at 1174, *citing DeShaney v. Winnebago County Dept. of Soc. Serv.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *see also Dudosh v. City of Allentown,* 665 F.Supp. 381, 388 (E.D.Pa.1987) *on reconsideration,* 722 F.Supp. 1233 (E.D.Pa.1989) ("[T]he [due process clause] does not impose upon the states an obligation to provide their citizens with ... adequate police protection."). Noting that the Supreme Court rejected an affirmative duty of protection theory in *DeShaney,* the court indicated that "an affirmative duty to protect may arise when the state restrains persons from acting on their own behalf." 54 F.3d at 1174. However, the court held that "[s]ome sort of confinement of the injured party—incarceration, institutionalization, or the like—is needed to trigger the affirmative duty. This Court has consistently read *DeShaney* to require a custodial context before an affirmative duty can arise under the Due Process Clause." *Id.* at 1175.

In addition to making custody a prerequisite to the affirmative duty to protect under 42 U.S.C. § 1983, *Pinder II* expressly rejected the theory that a "special relationship" giving rise to an affirmative duty to protect can be created by "explicit promises." The court stated that "[b]y requiring a custodial context as the condition for an affirmative duty, *DeShaney* rejected the idea that such a duty can arise solely from an official's awareness of a specific risk or from promises of aid.... Promises do not create a special relationship—custody does." *Id.*

Although *Pinder II* rejected the theory that a "special relationship" can exist in a context other than that which involves custody, the Court in *Pinder II* acknowledged that a police officer could be held liable for injuries to a plaintiff under § 1983 absent a custodial relationship where the police officer created or enhanced a danger faced by an individual. "When the state itself creates the dangerous situation that result[s] in the victim's injury, the absence of a custodial relationship may not be dispositive." *Id.* at 1177; *see also Gibson v. City of Chicago,* 910 F.2d 1510, 1521 n. 19 (7th Cir.1990) (noting that a constitutional duty to protect an individual against private violence may exist in a noncustodial setting if the state has taken affirmative action which increases the individual's danger of or vulnerability to, such violence beyond the level it would have been absent state action.).

In *Pinder II,* the Fourth Circuit detailed the differences between "creation of the danger" by affirmative misconduct—where liability exists—and the failure to protect—where liability does not exist. The Court stated that "[i]t cannot be said that the state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely." *Pinder II,* 54 F.3d at 1175. The Court further noted that "inaction" should not be "artfully recharacterized" as "action" by stretching the concept of " 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff." *Id.* at 1176, n. 1. Rejecting Pinder's creation of the danger claim, the court noted that "[n]o amount of semantics can disguise the fact that the real 'affirmative act' was committed by Pittman, not by Officer Johnson. As was true in *DeShaney,* the state did not 'create' the danger, it simply failed to provide adequate protection from it." *Id.*[7]

7. The Fourth Circuit's holding in *Pinder II* declining to impose a generalized duty upon police to protect individuals from violence is based upon sound public policy considerations worth repeating:

The recognition of a broad constitutional right to affirmative protection from the state would be the first step down the slippery slope of liability. Such a right potentially would be implicated in nearly every instance where a private actor inflicts injuries that the state

could have prevented. Every time a police officer incorrectly decided it was not necessary to intervene in a domestic dispute, the victims of the ensuing violence could bring a § 1983 action.... Broad affirmative duties thus provide a fertile bed for § 1983 litigation, and the resultant governmental liability would wholly defeat the purposes of qualified immunity.

If the right Pinder asserts were ever clearly established, it would entail other significant consequences. A general obligation of the

■ This Court finds that the holding in *Pinder II* precludes substantive due process liability in this case. First, this Court finds that there was no "special relationship" between Deborah, Amanda, Angela, Scott and James and the Moundsville Police Department that would give rise to a duty to protect. Plaintiffs have pointed to no specific facts that raise a genuine issue that Debra, Amanda, Angela, Scott and James, were in the custody, constructive or otherwise, of the Moundsville Police Department. Counsel for plaintiffs candidly conceded this point at the pretrial conference before this court. (*See* Transcript, Pre–Trial Conference, March 17, 1997 at p. 20). Further, the *Pinder II* court explicitly rejected the plaintiffs' argument that, even though custody was not present, a "special relationship" existed due to the promises and assurances made by the Moundsville Police Department to Deborah, Amanda, Angela, Scott and James. Accordingly, absent a custodial situation, *Pinder II* and *DeShaney* preclude plaintiffs' claims that a "special relationship" existed that obligated the police department to protect Deborah, Amanda, Angela, Scott and James from Michael's violence.

Further, plaintiffs have not established that the Moundsville Police Department took any affirmative action to create or enhance the danger that existed from Michael's behavior. This Court finds that this case is a quintessential "failure to act" case. The undisputed facts contain specific examples of police inaction: the Moundsville Police Department did not serve a temporary protective order; the Moundsville Police Department did not advise Deborah on every occasion of her victim's rights; and the Moundsville Police Department did not physically respond to some of Deborah's contacts with them about Michael's behavior. None of these facts, however, show that the police took any *affirmative action* to increase the danger to Deborah, Amanda, Angela, Scott or James. Rather, the "acts" outlined above, even if negligent, are examples of inaction rather than of intentional affirmative acts. *See Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986) ("[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."). Although this Court finds that it is possible that the Moundsville Police Department could have taken a more proactive approach to assist Deborah and her family in their difficulties with Michael, this Court finds that the Moundsville Police Department took no affirmative acts to increase the danger to Deborah, Amanda, Angela, Scott and James.

Plaintiffs attempt to avoid the "affirmative act" requirement of a "creation of the danger" theory by asserting that the police ratified and sanctioned Michael's violent behavior by their inaction and thereby increased the danger to Deborah, Amanda, Angela, Scott and James. However, this Court finds that although plaintiffs attempt to slightly alter their "creation of the danger" claim by equating "action" with "ratification and sanctioning," plaintiffs cannot avoid the affirmative act requirement. While plaintiffs' theory that a police department can create or enhance the danger faced by individual by ratifying and sanctioning certain conduct may be viable, this Court finds that plaintiffs are still required to show that the ratification and sanctioning resulted from certain affirmative police conduct, not just police inaction. Accordingly, plaintiffs' creation of the danger argument, regardless of how it is characterized, must fail.

■ Further, and in the alternative, even if plaintiffs could show that the Moundsville Police Department acted affirmatively to enhance or create the danger confronted by plaintiffs, plaintiffs have not set forth any specific facts which create a genuine issue for trial that the enhancement or creation of danger resulted from a City of Moundsville policy or custom. The plaintiffs have not

state to protect private citizens, whether broadly or narrowly conceived, effectively makes law enforcement officials constitutional guarantors of the conduct of others.... [I]f promises could override the qualified immunity defense, police would quickly learn never to reassure, even in situations where such assurances might be the best course of action. *Id.* at 1178.

presented any specific facts which arguably show that the City of Moundsville had a written or spoken plan of action that directed the officers to respond to Deborah's requests for assistance in the manner in which they did. The plaintiffs have presented no documentation of a specific City policy and have presented no deposition testimony or witness affidavits acknowledging such a policy. In fact, plaintiffs have not pointed to any evidence that would tend to show that the individual officers in this matter did anything but exercise their own discretion in applying the various statutes, regulations and policies governing the treatment of domestic violence situations.

Further, plaintiffs have presented no evidence that the treatment afforded to Deborah, Amanda, Angela, Scott and James was the result of any City custom. Plaintiffs have presented no credible evidence that the alleged failures of the police department with regard to Deborah's situation were part of a persistent and widespread practice so well-settled as to have the force of law. Plaintiffs have presented no deposition testimony, affidavits or documents which convinces this court that there is a genuine issue of material fact that any custom, apart from the written statutes, regulations, and procedures, existed regarding the treatment of domestic violence cases. Accordingly, this Court finds that defendant's motion for summary judgment on plaintiff's substantive due process claims must be granted.

### c. *Procedural Due Process Claims Under 42 U.S.C. § 1983*

Plaintiffs argue that the City of Moundsville deprived Deborah, Amanda, Angela, Scott and James of their constitutionally protected property and liberty interests arising from W. Va.Code §§ 48–2A–9(b) and (c) and 48–2A–10c(a) [8] by failing to advise Deborah of certain rights of victims of domestic abuse and by failing to serve the

Domestic Violence Temporary Protective Order upon Michael in a timely fashion. W. Va.Code §§ 48–2A–9(b) and (c) provide that:

(b) Any law-enforcement officer responding to an alleged incident of family violence shall inform the parties thereto of the availability of the possible remedies provided by this article and the possible applicability of the criminal laws of this state. Any law-enforcement officer investigating an alleged incident of family violence shall advise the person subject to abuse of the availability of the family protection shelter to which such person may be admitted.

(c) Any law-enforcement officer responding to an alleged incident of abuse shall, in addition to providing the information required in subsection (a) of this section, provide transportation for or facilitate transportation of the victim or victims, upon the request of such victim or victims, to a shelter or the appropriate court where there is reasonable cause to believe that such victim or victims have suffered or are likely to suffer physical injury.

W. Va.Code § 48–2A–10c(a) provides that:

When a law-enforcement officer observes any respondent abuse the petitioner and/or minor children or the respondent's physical presence at any location in knowing and willful violation of the terms of a temporary or final protective order issued by a magistrate, a circuit court judge or a family law master under the provisions of this article or subdivision (12), subsection (a), section thirteen [§ 48–2–13(a)(12) ], article two of this chapter granting the relief pursuant to the provisions of this article, he or she shall immediately arrest the respondent.

This Court finds that the above statutory provisions do not create an entitlement such that the failure to comply with the statutes amounted to a violation of Deborah, Amanda,

---

**8.** In their respective complaints, plaintiffs allege that the Moundsville Police Department also violated W. Va.Code §§ 48–2A–9(d) and (i) and 48–2A–10. However, in their response to defendant's motion for summary judgment, plaintiffs do not indicate their intent to rely on any of these additional statutes to support their procedural

due process claims. However, assuming plaintiffs intend to advance these statutes as a basis for a procedural due process claim, this Court finds that these statutes cannot support a procedural due process claim for the same reasons as set forth in this section.

Angela, Scott and James' procedural due process rights under the Fourteenth Amendment.

All procedural due process claims are evaluated under a two part inquiry. First, a court must assess whether an "individual possess[es] a protected interest such that the due process protections [are] applicable...." *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir.1994). If so, then the court must inquire whether "the individual [was] afforded an appropriate level of process." *Id.*

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). While it is clear that a state law may create a liberty or property interest that cannot be taken away without due process of law, it is also true that state laws mandating that certain procedures be followed in certain situations do not automatically create a protected entitlement. *See Olim v. Wakinekona*, 461 U.S. 238, 250–51, 103 S.Ct. 1741, 1748–49, 75 L.Ed.2d 813 (1983) (state-created procedures do not create an entitlement where none would otherwise exist). Rather, in order to raise a meritorious procedural due process claim based on a liberty or property interest created by a state law, a plaintiff must "show that the procedures that [were not followed] were enacted pursuant to a substantive constitutional obligation...." *Doe by Fein v. District of Columbia*, 93 F.3d 861, 868 (D.C.Cir. 1996).

In *Doe*, the United States Court of Appeals for the District of Columbia Circuit addressed the issue of whether a state law codifying procedures for investigating abuse and neglect created an entitlement to protection from abuse and neglect which could not be taken away without due process of law. In that case, the District of Columbia Prevention of Child Abuse and Neglect Act required that "upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly ... and, upon a finding of abuse and neglect, immediate steps shall be taken to protect the ... abused ... child." *Id.* at 865. Jane Doe, an abused child, argued that the District of Columbia's failure to investigate a claim of her abuse deprived her of her entitlement to protective services under the statute without due process of law.

Addressing her procedural due process claim, the court first noted that Doe's claim was "severely flawed." *Id.* at 868. The Court held that in order for the procedures mandated by the District of Columbia statute to give rise to a protected entitlement, the statute must have been enacted pursuant to a "substantive constitutional obligation." *Id.* The Court found Doe's procedural due process claim to be little more than a recasting of a *DeShaney* substantive due process claim. *Id.* Noting that *DeShaney* rejected the theory that a state can be held liable for a due process violation based upon the failure of the state to protect an individual against private violence, the court held that "by codifying procedures for investigating child abuse and neglect reports, D.C. has not assumed a constitutional obligation to protect children from such abuse and neglect. The fact that *Doe* can point to a D.C. statute mandating investigation does not, therefore, convert a meritless substantive due process claim into a fruitful procedural one." *Id.*

After holding that the statute did not vest an entitlement in Doe, the court further held that, even if Doe could show that she had a liberty or property interest under the statute, Doe could not show that any additional process was due before she could be deprived of her right. *Id.* Citing a similar Seventh Circuit holding, the *Doe* court held that Doe had failed to identify a remedy for any procedural violations and had also failed to show that her right to file suit against the District of Columbia was an inadequate remedy. *Id.* at 869–70 (citing *Doe by Nelson v. Milwaukee County*, 903 F.2d 499 (7th Cir.1990)). The court stated that "the proper means by which a plaintiff may seek redress for an alleged failure to comply with state and local child protection statutes is an action for damages under state and local law." *Id.* at 870.

Although plaintiffs seek to distinguish *Doe* from the instant case, this Court finds that

*Doe* is directly on point and provides a reasonable, logical analysis of this issue. Although this case is a domestic abuse case and not a child abuse case, the analysis in *Doe* has a direct application in this context. Here, plaintiffs have alleged that West Virginia state law vested in Deborah, Angela, Amanda, Scott and James two distinct entitlements. First, plaintiffs allege that W. Va. Code §§ 48–2A–9(b) and (c) entitled Deborah, Amanda, Angela, Scott and James, as victims of domestic violence, to be notified by the police of certain remedies available to them. Second, the plaintiffs alleged that under W. Va.Code § 48–2A–10c(a) Deborah, Angela, Amanda, Scott and James were entitled to timely service of the family violence temporary protective order issued against Michael. As did the Court in *Doe*, this court finds that plaintiff's arguments are flawed.

■ First, this Court finds that plaintiffs' procedural due process claim is merely a *DeShaney* claim couched in the language of procedural due process. Plaintiffs' essential argument is that by violating the statutory provisions the Moundsville Police Department did not protect Deborah, Amanda, Angela, Scott and James from Michael and increased the danger that Deborah, Amanda, Angela, Scott and James faced from Michael's behavior. As noted above, although a statute may prescribe and codify certain procedures for dealing with domestic violence and/or child abuse, the statute does not automatically create an entitlement that can be enforced by individuals. Rather, before the statute can give rise to a constitutionally protected entitlement it must be based on an independent, substantive constitutional right.

■ *DeShaney* clearly established that individuals do not have a substantive constitutional interest in receiving protection from the police absent a custodial relationship. Further, as discussed above, *Pinder II* established that a plaintiff cannot recover on a creation of danger theory simply by pointing to police inaction—in this case, a failure to give information and to timely serve a protective order. Accordingly, because there is not a substantive constitutional right upon which the procedures in the statutes are based, plaintiffs cannot succeed on their procedural due process claim.

■ In addition to finding that plaintiffs' procedural due process claim is based upon a flawed theory, this Court finds that plaintiffs' due process claim is factually incorrect. First, this court finds that the statutes requiring the police to inform a domestic violence victim of available assistance apply only when the police respond to an incident of domestic violence. In this case, the facts show that the police had contact with Deborah, Amanda and Angela when responding to two specific incidences of domestic violence and that Deborah, Amanda and Angela were advised of available assistance at least upon one occasion. However, the police did not at any time have contact with Scott and James in relation to incidences of domestic violence whereby the police would have had an obligation under the statute to inform them of domestic violence assistance programs. Thus, even if Deborah, Amanda and Angela were entitled to be informed of certain remedies under the statute, the police had no obligation under the statute to James and Scott.

Likewise, James and Scott cannot possibly be entitled to any protections under the statute that plaintiffs allege entitle them to timely service of the temporary protective order. Arguably Deborah may have been entitled to timely service of the temporary protective order because the order specifically prohibited Michael from contacting her. However, a review of this order indicates that James and Scott were not named in the order and the order did not prohibit Michael from having contact with them. Additionally, this Court finds that it is arguable that Amanda and Angela were not entitled to service of the protective order because the order did not prohibit Michael from having contact with them.

Further, this court finds that the plaintiffs' construction of W. Va.Code § 48–2A–10c(a) to create an interest in timely service of a protective order is erroneous. Assuming that the statute does create a liberty or property interest, the interest created by the statute is not the interest that plaintiffs assert. The statute indicates that a police

officer must arrest a person immediately if the person violates the terms of a protective order. The statute does not address, in any manner whatsoever, the service of a protective order. Accordingly, the statutory provision cited by plaintiffs cannot possibly entitle them to timely service of a protective order.

In the alternative, assuming that plaintiffs have adequately alleged a property or liberty interest arising from the above statutes, this Court finds that plaintiffs have not created a genuine issue of material fact as to the post-deprivation procedures that should have been afforded to Deborah, Angela, Amanda, Scott and James before they were deprived of their constitutional rights. Where the alleged deprivation of a liberty or property interest is not made pursuant to an established state procedure, the existence of an adequate post-deprivation remedy under state tort law is all the process that is due. *Doe*, 93 F.3d at 868. Here, plaintiffs have not suggested what post-deprivation procedure could have been employed to protect the interests of Deborah, Amanda, Angela, Scott and James. Further, plaintiffs have not indicated that their right to sue the City of Moundsville for an unconstitutional deprivation is an inadequate remedy. Accordingly, as the Court found in *Doe*, this court finds that the post-deprivation remedy of a lawsuit for damages is an adequate post-deprivation remedy that sufficiently protects plaintiffs' alleged entitlement. *Id.* at 870 ("[T]he proper means by which a plaintiff may seek redress for an alleged failure to comply with state or local child protection statutes is an action for damages under state and local law.").

Finally, and in the alternative, assuming that plaintiffs have shown that they have been wrongfully deprived of a constitutionally protected interest, this Court finds that plaintiffs have failed to show that this wrongful deprivation stems from a City of Moundsville custom or policy. As previously discussed, in order to impute liability upon a municipality for a civil rights violation, it must be shown that a municipal policy or custom must be the "moving force" behind the violation. *Spell*, 824 F.2d at 1387. Here, plaintiffs have presented no specific facts to dispute the defendant's position that the deprivation, if any, was not the result of a policy or custom. Accordingly, this Court finds, as a matter of law, that any deprivation of Deborah, Amanda, Angela, Scott and James' procedural due process rights cannot be attributable to the City of Moundsville.

d. *Equal Protection Claims Under 42 U.S.C. § 1983*

It has been repeatedly held that "[a]lthough there is no general constitutional right to police protection, the State may not discriminate in providing such protection." *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir.1988). In equal protection cases where it is alleged that police have provided less protection to victims of domestic violence based upon their status as either victims of domestic violence or as women, courts have applied a three-prong test to determine if the Equal Protection Clause has been violated by police conduct. "[I]n order to survive summary judgment, a plaintiff must go beyond the pleadings and submit specific facts that demonstrate that [ (1) a] policy or custom of the [police] to provide less police protection to victims of domestic assault than to other assault victims [or to provide less police protection to women than to men exists; (2) ] that discrimination was a motivating factor for the defendants and [ (3) ] that he or she was injured by operation of the policy or custom." *Hakken v. Washtenaw County*, 901 F.Supp. 1245 (E.D.Mich. 1995); *Watson*, 857 F.2d at 694 (applying test to claim of discrimination on the basis of status as domestic violence victim); *Hynson By and Through Hynson v. City of Chester*, 864 F.2d 1026 (3d Cir.1988).

Plaintiffs dispute that the above-stated test applies in cases where an equal protection claim is based upon a claim of discrimination on the basis of classification as victims of domestic abuse. However, this Court disagrees and finds that the test applies equally to cases based upon discrimination against victims of domestic abuse as well as in cases based upon discrimination against women. *See, e.g., Watson, supra.* (Applying test to equal protection challenge made on the basis of classification of victim of domestic abuse).

Further, plaintiffs argue that this standard announced in *Hakken* should not be adopted by this Court and that other courts have applied the less stringent standard as announced in *Thurman v. City of Torrington,* 595 F.Supp. 1521 (D.Conn.1984) and *Bartalone v. County of Berrien,* 643 F.Supp. 574 (W.D.Mich.1986). This Court finds, however, that *Thurman* and *Berrien* are not persuasive because both cases base equal protection recovery upon an affirmative duty to protect and both cases predate the United States Supreme Court decision in *DeShaney* which established that, absent certain circumstances, the police do not have an affirmative duty to protect. Further, this Court finds that the majority of circuit courts have applied the aforementioned three-prong test and that "the stringent standards imposed [by the test] are more in keeping with the Supreme Court's approach to equal protection challenges to facially neutral policies." *Soto v. Flores,* 103 F.3d 1056, 1068 (1st Cir. 1997). Accordingly, this Court will apply the above three-prong test to plaintiffs' equal protection claims in this case.

■■■■ Plaintiffs further argue that with regard to alleged discrimination based upon their status as victims of domestic abuse, they are not required to prove discriminatory intent because the custom of the police in rendering police protection was "facially discriminatory" to victims of domestic violence. This Court finds that this argument is meritless as a matter of law. The Supreme Court of the United States has held that a plaintiff in *any* equal protection case has the burden of proving discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). While the plaintiff need not prove that a discriminatory intent was the sole motivating factor, the plaintiff must show that a discriminatory purpose was a motivating factor. *Id.* "'Discriminatory purpose' ... implies more than an intent as volition or intent as awareness of consequences.... It implies that the decision maker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Admin. v. Feeney,* 442 U.S. 256, 279, 99

S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). There can be no "negligent" violations of an individual's right to equal protection. Only deliberate discrimination violates the equal protection clause. *Jackson v. City of Joliet,* 715 F.2d 1200, 1203 (7th Cir.1983), *cert. denied,* 465 U.S. 1049, 104 S.Ct. 1325, 79 L.Ed.2d 720 (1984). Discriminatory intent can be difficult to prove. "Without the smoking gun of an overtly discriminatory statement by a decision maker, it may be very difficult to offer sufficient proof of such a [discriminatory] purpose." *Soto,* 103 F.3d at 1067.

■■■■ Additionally, plaintiffs' claim of a "facially discriminatory custom" is also without factual support. To the extent that plaintiffs claim the written policy of the Moundsville Police Department was discriminatory, plaintiffs' own expert, Dr. Lee Weinberg, stated in his report that the Moundsville Police Department's policy for handling domestic violence calls was "a modern and proper written policy for the procedures for handling domestic violence and protective orders." This Court has also reviewed the policy and finds that it does not facially discriminate against persons on the basis of their status as victims of domestic violence. Further, a "custom" by its very nature is unwritten—it is a course of practice rather than a written procedure. Thus, it is not possible for the "custom" of the Moundsville Police Department to be "facially" discriminatory. Accordingly, this Court finds that, although plaintiffs argue otherwise, the alleged custom of the Moundsville Police Department is facially neutral and, therefore, the plaintiffs must prove discriminatory intent in order to withstand summary judgment on their equal protection claim.

■■■■ Having now determined what test must be applied to plaintiffs' equal protection claim, this Court now turns to an assessment of the undisputed facts under the *Hynson* test and finds that plaintiffs have failed to establish that the City intended to discriminate against Deborah as a woman or against Deborah, Angela, Amanda, Scott and James as victims of domestic violence in rendering its protective services. Plaintiffs

have presented no evidence, by documentation, affidavit or otherwise, of any discriminatory motive. This Court's review of the record reveals that the plaintiffs have no factual basis upon which to base any allegation of discriminatory intent. Although plaintiffs' expert engaged in an analysis of police records and concluded that the Moundsville Police Department responded to other crimes in a different manner than to crimes of a domestic nature, plaintiffs' expert has given no opinion regarding whether this alleged differential treatment is the product of a discriminatory motive.

 Further, and in the alternative, assuming that plaintiffs could raise a genuine issue of material fact that a discriminatory motive did in fact exist, the plaintiffs have failed to point to any specific facts which show that the discriminatory intent is imputable to the City by virtue of a policy or custom. As previously noted, the plaintiffs admit, through their expert, that the written policy of the Moundsville Police Department was proper. With regard to any police "custom," this Court's review of the record has uncovered no evidence that shows that any unfair or discriminatory behavior on the part of individual police officers is the result of a City-endorsed custom. Accordingly, this Court finds that, because plaintiffs have pointed to no facts which create a genuine issue of material fact that the Moundsville Police Department had a discriminatory motive in its method of responding to Deborah, Amanda, Angela, Scott and James, and because any allegedly discriminatory behavior was not the result of a City policy or custom, defendant's motion for summary judgment on plaintiffs' equal protection argument must be granted.

### 3. State Law Tort Claims

Under West Virginia law, "[a] political subdivision is immune from [tort] liability if a loss or claim results from ... the failure to provide, or the method of providing, police [or] law enforcement ... protection...." W. Va.Code § 29–12A–5(a)(5). In *Beckley v. Crabtree*, 189 W.Va. 94, 428 S.E.2d 317 (1993), the Supreme Court of Appeals of West Virginia defined the phrase "method of

providing police ... protection" as "the formulation and implementation of policy related to how police ... protection should be provided." *Id.*, 428 S.E.2d at 321. The court further held that when considering whether a political subdivision is immune under the statute, the Court should determine "whether the allegedly negligent act resulted from the manner in which a formulated policy regarding such protection was implemented." *Id.*

 In *Randall v. City of Fairmont Police Dept.*, 186 W.Va. 336, 412 S.E.2d 737 (1991), the West Virginia Supreme Court of Appeals clarified that the immunity provision contained in W. Va.Code § 29–12A–5(a)(5) is not absolute. Noting that liability of a local government entity for nondiscretionary functions cannot be predicated upon a breach of a general duty owed to the public as a whole, the court held that a political subdivision is not immune from suit where the existence of a "special relationship" between the police and a particular person has been established. *Id.* at 347, 412 S.E.2d 737. The court then repeated the four-part "special relationship" test previously announced by the court in *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307, 311 (1989):

> To establish that a special relationship exists between a local government entity and an individual, which is the basis for a special duty of care owed to such individual, the following elements must be shown: (1) an assumption by the local government entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

In *Wolfe*, the court elaborated upon the requirements for establishing a "special relationship." The court stated that the fourth element, justifiable reliance, provided "the essential causative link between the special duty assumed by the local governmental entity and the injury." *Id.* The court indicated

the significance of the reliance prong of the test noting that it enabled the court to impose liability where the municipality had "lulled the injured party into a false sense of security ... induced him either to relax his own vigilance or to forego other available avenues of protection." *Id.* The court further noted that the element requiring "direct contact" was necessary in order to show that a "special relationship" existed beyond that "relationship with the government that all citizens share in common," and that the direct contact requirement served to "rationally limit[ ] the class of individuals to whom the local governmental entity's 'special duty' extends." *Id.*, 387 S.E.2d at 311–12.

This Court finds that the City of Moundsville is entitled to judgment as a matter of law on plaintiffs' state tort claims. The City, a municipal corporation, is protected by the immunity provisions of the West Virginia statute. Plaintiffs have failed to establish that a "special relationship" existed between Deborah, Amanda, Angela, Scott and James and the City of Moundsville which would make the statute inapplicable.

 First, this Court finds that the tort immunity provision of W. Va.Code § 29–12A–5(a) applies in this case. Plaintiffs first argue that this action does not fall under the statute because plaintiffs seek to hold the City liable for its failure to provide "adequate" police protection rather than to provide "any" police protection. However, this Court finds that this is a distinction without a difference. This court finds that the statute does not distinguish, nor does any case interpreting the statute distinguish, between a case alleging *inadequate* police protection and *no* police protection. Accordingly, this court finds that the plaintiffs' allegations in the complaint places this action directly within the purview of the statute.

Plaintiffs further argue that the City cannot invoke the protections of the statute because this action does not implicate the "method" by which police protection was provided. Rather, plaintiff's state that this action concerns "the negligent implementation of [the police department's] domestic abuse policy." (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment filed February 14, 1997, p. 31). As noted above, the West Virginia Supreme Court in *Beckley* stated that "method" as used in the statute contemplated the "formulation and implementation" of police policy. *Beckley,* 428 S.E.2d at 321. Accordingly, to the extent that plaintiffs' claims seek recovery for the failure to properly implement certain policies, this Court finds that the immunity statute applies to those claims as well.

 Because this Court has found that the immunity statute applies to this action, this court must next consider whether a "special relationship" existed between Deborah, Angela, Amanda, Scott and James and the City such that the City's immunity under the statute does not exist in this case. This court finds, however, that plaintiffs have failed to show there is a genuine issue of material fact that a "special relationship" existed.

This court finds that plaintiffs have failed to show that Deborah, Amanda, Angela, Scott and James "justifiably relied" on any alleged promises or affirmative acts made by the police. As noted above, liability based upon a special relationship can exist only where the police have taken some action to create in an individual a false sense of security, have caused an individual to relax his own vigilance or have caused an individual to forego other available avenues of protection. *Wolfe,* 387 S.E.2d at 311. The undisputed facts in this case establish that Deborah did not relax her own vigilance or forego other available avenues of protection based upon any assurances made or actions taken by the Moundsville Police Department. After Deborah was attacked by Michael, she went to live with her mother in Wheeling; she did not stay at the house in Moundsville relying on the assumption that the Moundsville police would protect her. Further, when Deborah went to the house at 22 Oak Avenue, she went with two adult males, one of whom was carrying a firearm. Clearly, Deborah did not rely on past promises or assurances made by the police as the basis for her protection. Rather Deborah took other measures to attempt to ensure her safety.

Likewise, this Court finds that the undisputed facts establish that Scott and James

did not rely on the police for protection against Michael. The facts establish that when Scott went to the 22 Oak Avenue residence, he took a loaded firearm with him. Further, the plaintiffs have not pointed to any evidence which shows that James had been involved in any way with the police regarding Michael's behavior. Thus, this Court finds that the plaintiffs cannot successfully allege that James or Scott justifiably relied upon the Moundsville Police Department for protection. With regard to Amanda and Angela, this court finds that plaintiffs have cited no specific facts that would create a genuine issue of material fact that either Amanda or Angela justifiably relied on the police for protection. Accordingly, this Court finds that plaintiffs have failed to create a question of material fact as to the last prong of the "special relationship" test.

Further, this Court finds that Scott and James' state tort law claims must fail because plaintiffs have failed to establish that Scott and James had "direct contact" with the Moundsville Police Department. No reliable evidence has been presented by the parties which shows that James or Scott had any contact with the police concerning Michael's conduct. Although plaintiffs argue that the "direct contact" requirement does not apply to Scott and James, this Court declines to adopt plaintiffs' view of the *Wolfe* test because such a construction of the test would directly contradict the West Virginia Supreme Court's intent to narrowly limit "special relationship" liability to circumstances where the police do in fact have actual contact with an individual. *See Wolfe,* 387 S.E.2d at 312. Further, although it may be true that Deborah contacted the police for the benefit of the "rest of the world" in addition to herself, this Court finds that Deborah's intentions to elicit police protection for others is irrelevant to the special relationship test. Finally, this Court finds that an alleged awareness by the police that James and Scott were being threatened by Michael is not enough to establish "direct contact" under the test. Accordingly, this court finds that the state law claims of James and Scott must fail on this ground as well and that plaintiffs' state law tort claims must be denied.

Finally, and in the alternative, this Court finds that even if plaintiffs' state law claims are sufficient to withstand defendant's motion for summary judgment, plaintiffs' state law claims should be dismissed pursuant to 28 U.S.C. § 1367(c)(3). 28 U.S.C. § 1367 provides a federal court with supplemental jurisdiction over state law claims that "are so related to [federal] claims in the action ... that they form the same case or controversy." 28 U.S.C. § 1367(a). However, a "district court may decline to exercise supplemental jurisdiction over a state law claim over which it has original jurisdiction...." 28 U.S.C. § 1367(c)(3). Whether to dismiss supplemental claims is within the discretion of the district court. *Shanaghan v. Cahill,* 58 F.3d 106 (4th Cir. 1995). Because this Court has summarily disposed of all of plaintiffs' claims over which this Court has original jurisdiction, this Court finds, in its discretion, that the state law claims, in the event that the claims have merit, should be dismissed without prejudice.

## VI. *Conclusion*

Based on the above discussion, this Court GRANTS defendant's motion for summary judgment on all counts. These consolidated actions are DISMISSED and STRICKEN from the active docket of this Court.